## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NANCY FETHER, *et al.*                             :

                                         :

                                         :

         v.                                       :       Civil No. CCB-12-1674 (consolidated)

                                         :                CCB-13-1083

                                         :

FREDERICK COUNTY, MARYLAND, *et al.*  :

### MEMORANDUM

       Justin Michael Lihvarchik was detained at the Frederick County Adult Detention Center

("Detention Center") early in the morning of June 10, 2009.  A few hours after being placed into

his cell, he committed suicide by hanging himself by his shoelaces from the top bunk in his cell.

Plaintiff Nancy Fether—Lihvarchik's mother and personal representative of his estate—brings

this consolidated civil rights lawsuit[1] against four deputies from the Frederick County Sheriff's

Office[2]; four correctional officers working at the Detention Center[3]; Frederick County Sheriff

Charles Jenkins; and Frederick County.  Fether alleges defendants' deliberate indifference to her

son's serious medical needs resulted in her son's death at the Detention Center.  She also alleges

gross negligence.  Presently pending is a motion for summary judgment filed by the deputies and

correctional officers.  At this stage, the court considers only the Fourteenth Amendment claims

as to the eight defendants and the gross negligence claim as to the four deputy defendants.[4]  For

the reasons stated below, the motion will be granted in part and denied in part.

### BACKGROUND

---

[1] Fether filed separate lawsuits in the Circuit Court for Frederick County and this District.  On April 11, 2013, the state court case was removed to this court and docketed as WMN-13-1083.  That case was reassigned to this judge and consolidated with the case originally filed in this District (i.e., CCB-12-1674).  CCB-12-1674 is the lead case.
[2] They are Anthony LoRusso, Christopher Turvin, Kevin Poole, and Jeffrey Hyatt.
[3] They are Orlando Rosa, Jesse Burris, Ryan Harris, and Gilbert Sackett.
[4] Previously, the court bifurcated and stayed the *Monell* claim against Frederick County's Sheriff in his official capacity and Frederick County.  (*See* Mem. Op. on Mot. Summ. J. 12-13, ECF No. 24.)

At around 1 a.m. on June 10, 2009, Debra Miller called 911 to report that a renter in her basement had been "messing up the house" and was "tearing the driveway up" in his car. (Defs.' Mot. Summ. J. Ex. A, 911 Call, at 0:17.)[5] That renter was Justin Michael Lihvarchik—whose tragic suicide is at the heart of this case.

Lihvarchik had been drinking with Miller and his girlfriend, Cara Dempsey, in his basement apartment late on the night of June 9, 2009. At some point, Lihvarchik became abusive towards both women. (*See* Defs.' Mot. Summ. J. Ex. K, Miller Dep. 81, ECF No. 85-12.) He had pushed and thrown them around, (911 Call, at 8:35), and had "already bruised [Miller] one time" that night, (*id.* at 3:24). In Miller's words, he was acting "like freaking nuts." (*Id.* at 4:02.)

Lihvarchik's behavior in the kitchen was particularly disturbing. Earlier, while all three were in the kitchen, Lihvarchik had grabbed a steak knife from a drawer and, without saying a word, held it against his throat. (Miller Dep. 59.) He held the knife there until Miller and Dempsey yelled at him to put it down. (*Id.*) He complied, but almost immediately after putting the knife down, picked up a pizza cutter that was on the kitchen counter. (*Id.* at 60.) This time Lihvarchik went further; he touched the pizza cutter to his neck and "drew it across his throat" with enough force that blood was "dripping out" of his neck. (*Id.* at 62-63.) In Miller's estimation, this gesture left a mark that was four to five inches long. (*Id.* at 64.) On seeing this gesture, Miller jumped up and pleaded for Lihvarchik to stop, telling him she was scared. (*Id.* at 62.) Meanwhile, Dempsey wrested control over the pizza cutter and placed a rag on his neck "where it was bleeding." (*Id.* at 63.) At no point did Lihvarchik resist or say a word. (*Id.*)

---

[5] Defendants' exhibit A is a CD containing audio files of both Miller's 911 call and the 911 dispatcher's radio broadcasts. The court will refer to the former as "911 Call" and each of the thirty-five latter recordings by the ninth through fourteenth digits of the filename, which appear to represent a timestamp, followed by "Radio." For example, the radio recording entitled, "2009-06-10-01-03-48-072-Recorder"—which the court interprets to mean a radio recording made shortly before 1:04 a.m. on June 10, 2009—will be referred to as "01-03-48 Radio."

Over the course of seventeen minutes, Miller recounted that evening's events to the 911 operator. Several of Miller's statements are particularly relevant. Just under six minutes into the call, Miller—distressed by Lihvarchik's behavior—stated, "he needs to get fixed. He needs an intervention. He needs an intervention. He's not right." (911 Call, at 5:45.) Miller then said that Lihvarchik "tried to cut his own throat with a pizza knife tonight." (*Id.* at 5:55.) When the operator asked whether "he cut himself when he did it," Miller clarified, "yeah, you'll see a knife [inaudible] on his throat when you get him. . . . Believe me, it's there." (*Id.* at 6:27.) After further describing how Lihvarchik had pushed her and Dempsey that night, Miller confirmed that the pizza cutter Lihvarchik had used was still with him in the basement. (*Id.* at 10:27.) She confirmed again that "he cut himself by that [pizza cutter]—yes he did!" (*Id.* at 10:37.) Just over a minute later, as she was describing how she and Dempsey had "got hurt" by Lihvarchik, Miller incredulously exclaimed, "he did it with a fucking pizza cutter! He cut himself with . . . [inaudible]." (*Id.* at 12:30.) Several minutes later, the 911 operator confirmed that the deputies "have him," at which point the call ended. (*Id.* at 16:20.)

As Miller was communicating with the 911 operator, a police dispatcher was issuing dispatches over the police radio.[6] The first dispatch advised that "a 1056 subject there messing up the house is reported to now be driving around outside the residence." (01-02-18 Radio, at 0:15.) About five minutes later, the dispatcher reported—in clear, audible language—that "apparently the male subject also tried to cut his throat this evening with a pizza cutter." (01-08-16 Radio, at 0:00.) Four minutes later, an unidentified deputy asked whether the suspect "ha[d] any weapons or anything on him," to which the dispatcher responded, "he had the pizza cutter earlier—that should be it." (01-12-13 Radio, at 0:07.) Between the dispatcher's statements

---

[6] As the deputies' deposition testimony and the call and radio logs reflect, the information received by the 911 operator is not necessarily the same information that is broadcast out on the police radio by the dispatcher. (*See* Defs.' Mot. Summ. J. Ex J, Hyatt Dep. 91, ECF No. 85-11.)

regarding the unfolding events, several unidentified voices acknowledged the dispatcher's reports, asked clarifying questions, and provided reciprocating updates.

Some of the dispatcher's statements were also sent, in text form, to the computers in the deputies' cars. (*See* Defs.' Mot. Summ. J. Ex. I, Poole Dep. 82, ECF No. 85-10.) The information the deputies "were receiving from the dispatcher as [they] responded to the scene" included the following two text statements: "Caller states that subject tried to cut his throat with a pizza cutter earlier tonight" and "has mark on neck from it." (*Id.* at 82-83.)

* * *

Several deputies from the Frederick County Sheriff's Office—all named in this lawsuit— responded. With the exception of Deputy LoRusso, the deputies testified in their depositions that they did not hear the dispatcher say Lihvarchik had tried to cut his own neck with a pizza cutter. (*See, e.g.*, Defs.' Mot. Summ. J. Ex. G, Turvin Dep. 16, ECF No. 85-8.) According to Deputy Turvin, he "didn't hear that" statement because he was "concentrating on driving." (*Id.* at 17.) Deputy Poole did not recall hearing that Lihvarchik had tried to cut himself, but only "that he had a pizza cutter"—it had "vaguely be[en] mentioned" on the radio. (Poole Dep. 19, 48.) Deputy LoRusso denied being "told" that Lihvarchik had tried to cut himself with a pizza cutter, (Defs.' Mot. Summ. J. Ex. B, LoRusso Dep. 21, ECF No. 85-3), but then admitted he had heard the dispatcher make that statement, (*id.* at 21-22). He noted, however, that, even though "the dispatcher put that [statement] out . . . that doesn't make it true." (*Id.* at 21.)[7]

All four deputies arrived at Miller's home within a five-minute span, beginning at 1:15 a.m. (Defs.' Mot. Summ. J. Ex. H, Background Event Chronology, ECF No. 85-9.) Deputy Turvin arrived first. He spoke briefly with Miller and Dempsey, who mentioned that Lihvarchik

---

[7] Although the deputy defendants contest whether they actually heard all of these dispatches, they do not claim, for instance, that the radio units in their police cruisers were off. Nor could they. Were that the case, they would not have even known to report to the scene of the incident.

had a pizza cutter with him. (Turvin Dep. 21.) Deputy Turvin then proceeded downstairs to find

Lihvarchik. (*Id.*) Because Deputy Hyatt had arrived by this time, they entered Lihvarchik's

basement unit together, where they found Lihvarchik, handcuffed him, and brought him out onto

the front porch. (Hyatt Dep. 38, 47; Turvin Dep. 22.) After assisting Deputy Turvin with the

arrest, Deputy Hyatt served primarily as "cover."[8] (Hyatt Dep. 51.)

Deputy Turvin began to interview Lihvarchik, asking him "what was going on[,]" "what

his intention was about a pizza cutter[,]" and whether he was trying to hurt himself.[9] (Turvin

Dep. 25.) Lihvarchik denied having tried to hurt himself, and did not acknowledge anything

regarding a pizza cutter. (*Id.*) Although Deputy Turvin claimed he did not know Lihvarchik had

tried to cut himself with a pizza cutter, he stated he "gave [Lihvarchik] a suicide screening[.]"

(*Id.* 47.) Deputy Turvin said he had asked Lihvarchik questions about self-harm "I guess

because he had, they said he had a pizza cutter in his hand" and "[t]o see if he was suicidal." (*Id.*

at 26, 37.) As part of this screening, Deputy Turvin observed Lihvarchik's behavior and physical

condition. (*See Id.* 39.) He noticed Lihvarchik had an alcoholic "odor," "slurred" speech, and

"bloodshot and glassy eyes." (*Id.* at 37.) And he used his flashlight to "[l]ook[] at

[Lihvarchik's] face and neck area" but did not recall seeing any marks. (*Id.* at 39, 47.)

At some point, Deputy Poole, who had arrived as back-up officer, joined Deputy Turvin

in questioning Lihvarchik. (*Id.* at 77.) Deputy Poole asked similar questions about whether he

had harmed himself recently. (Poole Dep. 56.) Like Deputy Turvin, Deputy Poole did not recall

being told that Lihvarchik had cut his neck with a pizza cutter, and instead "remember[ed] the

---

[8] According to the law enforcement principle of "contact and cover," the job of the officer playing the role of cover "is to disengage and watch everybody else. It's not to interview [the suspect] or anything like that. My job is to make sure everything else is okay." (Hyatt Dep. 51.) Deputy Hyatt played this role, standing "15 feet away just watching everything else and making sure that nothing else happened." (*Id.*)

[9] The deputies had training and experience with suicidal individuals. They had received training in suicide prevention and assessment and knew how to probe for suicidal intent. (*See, e.g.*, Hyatt Dep. 11, 30-31; Turvin Dep. 5.) The deputies also understood the proper protocol for seeking an emergency petition. (*See, e.g.*, Hyatt Dep. 18.) And they had dealt with suicidal individuals numerous times in their careers. (*See, e.g.*, Turvin Dep. 8.)

pizza cutter being brought up very—very vaguely." (*Id.* at 17.) He also "tried looking at [Lihvarchik's] entire body" with a flashlight for injuries and saw no marks on his neck. (*Id.* at 46-47.) Deputy Poole did not speak to Miller or Dempsey. (*Id.* at 66.)

Meanwhile, Deputy LoRusso, the arresting officer, had arrived and was interviewing Dempsey and Miller upstairs. Dempsey began by explaining the circumstances of the dispute that had led Lihvarchik to assault her. (LoRusso Dep. 36.) After hearing her "blow by blow" account, Deputy LoRusso asked Dempsey about the pizza cutter. (*Id.* at 38.) Dempsey told him Lihvarchik's use of the pizza cutter was a "tactic . . . to gain sympathy from her for whatever purpose"—"in this case, because he wanted her to come to bed." (*Id.* at 29.) Deputy LoRusso learned that this "feigning some kind of . . . traumatic event" was a "common tactic" that Lihvarchik had "previously done." (*Id.* at 29-30.) Miller told LoRusso she basically agreed with Dempsey's account of the evening. (*Id.* at 57.)

Deputy LoRusso also interviewed Lihvarchik. (*See id.* at 69.) He asked questions like, "are you injured" and "are you okay." (*Id.*) Deputy LoRusso testified that he did not notice any unusual marks on Lihvarchik's neck when he visually inspected him. He explained that "it was 1 o'clock in the morning" and that, after Lihvarchik answered "medical screening-type questions," he saw no indication that Lihvarchik was injured, cut, or bleeding. (*Id.* at 20-21.) He also stated the "collar was up" on Lihvarchik's t-shirt, which would have obscured his neck. (*Id.* at 32.)

Having determined there was enough to support a charge of criminal assault, Deputy LoRusso transported Lihvarchik to the Detention Center. (*Id.* at 72.) The drive took about thirty minutes. (*Id.* at 71.) During this time, he continued his conversation with Lihvarchik, who exhibited "pretty calm" and "decent" behavior. (*Id.* at 72.)

Meanwhile, Deputy Turvin remained on the scene and asked Dempsey to fill out two domestic violence forms.  (Turvin Dep. 27.)  Dempsey completed the forms in Deputy Turvin's presence.  (*Id.* at 29.)  After receiving the completed forms, Turvin "skimmed over" them for completeness, but did not "read it verbatim."  (*Id.*)  In the victim statement of the domestic violence report, Dempsey wrote that "[Lihvarchik] cut the side of his throat with a pizza cutter and begged me to go to bed."  (Defs.' Mot. Summ. J. Ex. E, Frederick County Domestic Violence Report, ECF No. 85-6.)  On the domestic violence lethality screen form, Dempsey marked "No" to ten of the eleven questions regarding Lihvarchik.  (Defs.' Mot. Summ. J. Ex. F, Domestic Violence Lethality Screen, ECF No. 85-7.)  The only question to which she marked "Yes" was "Has he/she ever tried to kill himself/herself?"  (*Id.*)

\* \* \*

At around 2 a.m., Deputy LoRusso arrived at the Detention Center and dropped Lihvarchik off at the central booking area.  (LoRusso Dep. 111.)  Deputy LoRusso never communicated anything about the pizza cutter or any risk of suicide to Detention Center employees.[10]  (LoRusso Dep. 156-57.)  After handing Lihvarchik over, Deputy LoRusso began completing paperwork associated with the arrest on a computer in the central booking area.  (*Id.* at 90, 94.)  At some point, Deputy Turvin arrived, gave Deputy LoRusso the domestic violence forms, and left without telling Deputy LoRusso about the contents of the forms.  (*Id.* at 101-03.)  Deputy LoRusso glanced over the forms for completeness, but otherwise did not read them.  (*Id.* at 102.)  Deputy LoRusso kept these forms and returned them to patrol headquarters at the end of

---

[10] In his deposition, Correctional Officer Rosa confirmed the general absence of communication between deputies and correctional officers when arrestees are brought to the Detention Center.  When asked what conversations he typically had with deputies during this process, he said, "[n]ot much, you know.  [The deputy] just provides us the paperwork and we input the information."  (Defs.' Mot. Summ. J. Ex. L, Rosa Dep. 31, ECF No. 85-13.)  Correctional Officer Burris also confirmed that Deputy LoRusso "didn't say anything to me" about Lihvarchik attempting suicide.  (Defs.' Mot. Summ. J. Ex. P, Burris Dep. 61, ECF No. 85-16.)

his shift, at around 7 a.m.[11]  (LoRusso Dep. 112.)  All told, Deputy LoRusso spent about forty

minutes at the Detention Center processing Lihvarchik's arrest.  (*Id.* at 100.)

 Meanwhile, the Detention Center had begun processing Lihvarchik on its end.

Correctional Officer Burris conducted the intake assessment, while Correctional Officer Rosa,

the more senior correctional officer, supervised.  (*See* Rosa Dep. 36-37; Burris Dep. 32.)

Lihvarchik indicated to Correctional Officer Burris that he had consumed a "few beers" but

otherwise did not have any life-threatening injuries or serious medical conditions.  (Defs.' Mot.

Summ. J. Ex. Q, Intake Assessment Form, ECF No. 85-17.)  At some point during this process,

Officer Rosa took Lihvarchik's fingerprints.  (Rosa Dep. 43.)

 Correctional Officers Rosa and Burris took photographs of Lihvarchik during intake.

Officer Burris took a standard booking photograph.  (Pl.'s Opp'n Ex. 8, Booking Photo, ECF No.

92-8.)  This photograph shows a bust shot of Lihvarchik, who is wearing a collarless grey t-shirt

and holding an expressionless pose.  The photograph also shows a thin red mark that encircles

the base of his neck.  Officer Rosa took a "tattoo photo," (Pl.'s Opp'n Ex 9, Tattoo Photo, ECF

No. 92-9), to check for gang affiliations because Lihvarchik apparently had two "skull" tattoos

on his shoulders, (Defs.' Mot. Summ. J. Ex. R, Central Booking Information Sheet, ECF No. 85-

18).  This photograph shows substantially the same view of Lihvarchik as the booking photo:

Lihvarchik is wearing a t-shirt with his neck exposed and the red mark encircling his neck still

visible.  Oddly, despite being called a "tattoo photo," no tattoos are visible.  Both Correctional

Officers Rosa and Burris stated they did not see the line across Lihvarchik's neck at any point

that night.  (Rosa Dep. 51, 53; Burris Dep. 38.)

---

[11] The Detention Center does not receive these domestic violence forms.  (LoRusso Dep. 113.)  And, that night, Deputy LoRusso did not share any police reports with Correctional Officers Rosa and Burris.  (Burris Dep. 73.)

After Correctional Officers Rosa and Burris completed the intake process, Lihvarchik asked Correctional Officer Rosa if he could take a nap somewhere before appearing before a commissioner.  (Rosa Dep. 67.)  Responding to Lihvarchik's request, Correctional Officer Rosa took him to the holding unit, and placed him in a cell with a double bunk.  (*Id.* at 68.)  Before returning to central booking, Correctional Officer Rosa stopped by the holding unit's command post to convey that Lihvarchik had been placed in a holding unit cell.  (*Id.* at 71.)  Because they were working in central booking, Correctional Officer Rosa and Burris had no further responsibility to supervise or monitor Lihvarchik once he had been dropped off in the holding unit.[12]  (Burris Dep. 11.)  Neither correctional officer returned to the holding unit that evening.

Correctional Officers Harris and Sackett were working the holding unit's night shift that evening.  (Harris Dep. 18.)  They knew Correctional Officer Rosa had placed Lihvarchik into a cell in the holding unit, but did not know why.  (Sackett Dep. 50.)  And, although Detention Center policy required them to walk through the holding area every twenty minutes to check on detainees, (*id.* at 41), both correctional officers concede they did not do any walkthroughs that night—with Correctional Officer Sackett even logging that he had completed the checks when, in fact, he had not (*id.* at 45).  Instead, both correctional officers remained in the command post, where they completed "other job duties" and did "personal stuff" on the computer, including playing fantasy sports on Yahoo.  (*Id.* at 41.)

At about 5:30 a.m. on June 10, 2009, Correctional Officer Harris began walking around the holding unit to feed detainees.  (Harris Dep. 24-25.)  On arriving at Lihvarchik's cell, he found Lihvarchik hanging from the top bunk by shoelaces tied around his neck.  (*Id.* at 25.)

---

[12] Correctional Officer Harris disagrees with this description.  He claimed Detention Center policy and procedure at the time meant that Correctional Officers Burris and Rosa should have been checking on Lihvarchik because he was a "central booking offender."  (Defs.' Mot. Summ. J. Ex. S, Harris Dep. 150-51, ECF No. 85-19.)  But his counterpart, Correctional Officer Sackett, agreed that correctional officers in holding would be—and were—responsible for a detainee in Lihvarchik's situation.  (Defs.' Mot. Summ. J. Ex. U, Sackett Dep. 51, ECF No. 85-21.)

Lihvarchik was dead.  According to the autopsy completed a day later, Lihvarchik had "committed suicide by hanging."[13]  (Defs.' Mot. Summ. J. Ex. W, Ali Aff. ¶ 11, ECF No. 85-23.)

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  Whether a fact is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.*  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted).  At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (citation and quotation marks omitted).

As an initial matter, the court will grant summary judgment to defendants Hyatt, Sackett, and Harris on all counts.  In her opposition, Fether states that, based on the evidence gathered

---

[13] In the opinion of the Assistant Medical Examiner who conducted the autopsy, the "reddish mark" on Lihvarchik's neck was "a bruise or contusion, and not a cut."  (*Id.* at ¶ 12.)

during discovery, Deputy Hyatt responded to the scene of Lihvarchik's arrest but merely served as "cover" for the other three officers involved in the arrest.  (Pl.'s Opp'n 3 n.4, ECF No. 94.)  Fether also agrees that Correctional Officers Sackett and Harris were on holding unit duty when Lihvarchik committed suicide but "were never told about Mr. Lihvarchik and never observed his condition before his suicide."  (*Id.*)  Accordingly, Fether does not—nor do the defendants— oppose dismissal of these three defendants from this case.

As a result, the following claims remain for the court's disposition: the federal Fourteenth Amendment claims brought under section 1983 against Deputies LoRusso, Turvin, and Poole, and Correctional Officers Rosa and Burris; and the state gross negligence claim against Deputies LoRusso, Turvin, and Poole.  The court considers these claims in turn.

## I.   Federal Fourteenth Amendment Claims

Fether brings Fourteenth Amendment claims under section 1983 against the five remaining individual defendants.  To prevail on a section 1983 claim, a plaintiff must prove (1) that a defendant deprived her "of a right secured by the Constitution or laws of the United States" and (2) that such deprivation was committed under the color of state law.  *Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  The defendants do not contest the second prong, but instead argue they did not engage in unconstitutional conduct.

As a threshold matter, the court will dismiss as duplicative the Fourteenth Amendment claims asserted under the "special relationship" and "state created danger" theories.  The defendants argue the former count "state[s] no cause of action separate from or greater than the Fourteenth Amendment due process claim[,]" (Defs.' Mot. Summ. J. 62, ECF No. 85-1), and the latter count is "inapplicable to this case because there is no evidence that a third party harmed Mr. Lihvarchik," (*id.* at 65).  By failing to respond to these colorable arguments in her

opposition, Fether abandoned those claims.  *See, e.g.*, *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp.

1236, 1247 (D. Md. 1997) ("[Plaintiff] abandoned her . . . claim by failing to address [it] in her

opposition to [defendant]'s motion for summary judgment, or to offer clarification in response to

[defendant]'s reply brief.")  Accordingly, only Fether's Fourteenth Amendment due process

claim remains for the court's consideration.

Fether, as representative of a pretrial detainee, can "make[] out a [Fourteenth

Amendment] due process violation if [s]he shows 'deliberate indifference to serious medical

needs' within the meaning of *Estelle v. Gamble*, 429 U.S. 97 (1976)."  *Martin v. Gentile*, 849

F.2d 863, 871 (4th Cir. 1988) (citations omitted).[14]  The *Estelle* standard—as elaborated by the

Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994)—requires proof (1) "that the

deprivation of [a] basic human need was *objectively* sufficiently serious" and (2) "that

*subjectively* the officials act[ed] with a sufficiently culpable state of mind."  *De'lonta v. Johnson*,

708 F.3d 520, 525 (4th Cir. 2013) (emphases and alterations in original) (quoting *De'lonta v.

Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).  Fether easily satisfies the first prong because "[a]

substantial risk of suicide is certainly the type of 'serious harm' that is contemplated by . . .

*Farmer*."  *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001).

To satisfy the second prong, Fether must prove "deliberate indifference" on the part of

the defendants.  *See Farmer*, 511 U.S. at 837; *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006).

That is, she must prove that the defendants "*actually knew of* and *disregarded*" Lihvarchik's

substantial risk of suicide.  *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004)

(emphases in original) (quoting *Young v .City of Mount Rainier*, 238 F.3d 567, 575-76 (4th Cir.

2001)).  Because this is "a higher standard for culpability than mere negligence or even civil

---

[14] Further, a pretrial detainee, who is presumed innocent of any crime, "may not be subjected to *any* form of
'punishment.'"  *Id.* at 870 (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

recklessness," *Jackson v. Lightsey*, --- F.3d. ---, No. 13-7291, 2014 WL 7210989, at *5 (4th Cir.

Dec. 18, 2014), defendants must have both "be[en] aware of facts from which the inference

could be drawn that a substantial risk of [suicide] exist[ed]," and "draw[n] th[at] inference."

*Danser v. Stansberry*, 772 F.3d 340, 347 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837).

Despite this "very high standard[,]" *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999), actual

knowledge "is a question of fact subject to demonstration in the usual ways, including inference

from circumstantial evidence[,]" *Parrish*, 372 F.3d at 303 (quoting *Farmer*, 511 U.S. at 842).

Here, it is uncontested that none of the defendants took any action to prevent Lihvarchik

from committing suicide.  But the defendants argue they did not have actual knowledge under

the *Farmer* standard.  Accordingly, the court must answer the following: does a genuine dispute

exist as to whether the defendants (1) were aware of facts from which they could infer that

Lihvarchik was suicidal, and (2) did in fact make that inference?  If the answer to each question

is yes, then summary judgment must be denied.  Because it is undisputed that Deputy LoRusso

did not relay any information regarding Lihvarchik's suicide risk to any of the correctional

officers—and, therefore, the two groups of defendants possessed different knowledge—the court

considers the two groups separately, starting with the correctional officers.

### A.  Correctional Officers Rosa and Burris

As already noted, Deputy LoRusso did not relay any information regarding the context of

Lihvarchik's arrest to anyone at the Detention Center.  Deputy Turvin similarly failed to relay

Dempsey's statements regarding Lihvarchik's suicidal behavior contained in the domestic

violence forms.  The record reveals no direct evidence that Correctional Officers Rosa and Burris

had actual knowledge of Lihvarchik's suicide risk; Lihvarchik did not make any statements

during intake indicating past or present suicidal acts or intentions.  The circumstantial evidence

upon which the correctional officers' actual knowledge could be inferred is similarly lacking. The correctional officers saw nothing out of the ordinary in Lihvarchik's booking; they had no reason to question Lihvarchik more extensively as he was being booked.   The only evidence from which they could have learned about Lihvarchik's suicide risk is their observation of Lihvarchik while they processed him.   And what the correctional officers observed is reflected in the two photographs taken of Lihvarchik.   The court considers this visual evidence here.   *See Scott*, 550 U.S. at 380-81 (expressly permitting, on review of denial of motion for summary judgment, reliance on videotape evidence).

Although the photographs show a red mark around Lihvarchik's neck, this evidence does not create a genuine dispute as to whether Correctional Officers Rosa and Burris had actual knowledge of Livharchik's suicidal tendencies.   It is true that Correctional Officers Rosa and Burris had an opportunity to observe Lihvarchik's appearance while processing him.   At some point during that process, they would have seen Lihvarchik's neck.   And, although Correctional Officers Rosa and Burris claim not to have seen the red mark on his neck, the court assumes, for the purposes of this motion, that they did see that mark.   *See, e.g.*, *Brown*, 240 F.3d at 390 (crediting, on review of grant of judgment as a matter law, probation officer's testimony that she informed correctional officer that detainee was suicidal and had attempted suicide one week earlier, even though correctional officer denied such knowledge).   But no reasonable factfinder could conclude that they also drew an inference that Lihvarchik was suicidal based solely on the observation of that mark.   Assuming Correctional Officers Rosa and Burris "had noticed the [red mark], [their] failure to recognize that it was the result of a previous suicide attempt amount[s] at most to simple negligence."   *Ward v. Holmes*, 28 F.3d 1212, at *5 (4th Cir. 1994)

(unpublished)[15]; *see also Freedman v. City of Allentown*, 853 F.2d 1111, 1116 (3d Cir. 1988)
(holding that a prison official's failure to recognize "suicide hesitation cuts" on a prisoner's
wrists, elbows, and neck, "without more, amount[ed] only to negligence").  Absent evidence
showing that they actually drew the inference that Lihvarchik was suicidal, Correctional Officers
Rosa and Burris did not, as a matter of law, act with deliberate indifference towards Lihvarchik's
risk of suicide.  Accordingly, the court will grant summary judgment in favor of defendants Rosa
and Burris on this count.

### B.  Deputies LoRusso, Turvin, and Poole

The deputies' situation is different.  The record reveals that, before the deputies arrived at
the scene of Lihvarchik's arrest, radio messages from the 911 dispatcher clearly and audibly
stated Lihvarchik had cut himself with a pizza cutter.  Furthermore, the dispatcher sent text
communications conveying the same information to the computers in the deputies' police cars.
Importantly, the dispatcher's communications were not made on a one-way channel; throughout
the radio recordings, the dispatcher engaged in an ongoing conversation with the deputies who
were responding to the scene.  Upon arrival, the deputies interviewed Lihvarchik about whether
he had or would hurt himself and inspected him for signs of self-harm.  They were close enough
to Lihvarchik to detect an odor of alcohol and, together, had numerous opportunities to observe
not only Lihvarchik's appearance, but also his behavior.  Finally, Deputy Turvin had the
domestic violence forms, which explicitly indicated that Lihvarchik had previously tried to kill
himself and that he had cut his throat with a pizza cutter that night.  In short, the deputies had a
much richer context from which an inference might be drawn that Lihvarchik was suicidal.

In light of that context, a genuine dispute exists as to whether the deputies actually drew
the inference that Lihvarchik was suicidal.  On the one hand, evidence in the record suggests the

---

[15] Unpublished cases are cited for the soundness of their reasoning, not for any precedential value.

deputies did not have actual knowledge of such a risk.  In their depositions, the deputies claim

they neither saw the red mark on Lihvarchik's neck nor inferred from that mark—or, for that

matter, any other information they had at the time—that Lihvarchik was suicidal.  And the record

reveals no direct evidence of Lihvarchik's suicide risk.  On the other hand, Lihvarchik did not

need to state explicitly that he was suicidal for the deputies to have gained actual knowledge of

his suicidal tendencies, because actual knowledge can be proven with circumstantial evidence.

*See Parrish*, 372 F.3d at 303.  And the circumstantial evidence here could lead a reasonable

factfinder to conclude the deputies did in fact draw that inference based on the radio and text

dispatches, their interview and visual inspection of Lihvarchik, and Lihvarchik's behavior.  The

deputies deny having actually made such an inference.  But a reasonable factfinder could reach

the opposite conclusion.  And "[a]lthough a jury ultimately may find that the [deputies]' version

of the events is more credible, [the court] is not permitted to make such credibility

determinations" here.  *Meyers v. Balt. Cnty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013).

In their reply brief, the deputies make the additional argument that, even if they had some

inkling of suspicion that Lihvarchik was at risk of self-harm and actually made such an

inference, they would still avoid liability if they "responded reasonably to the risk of which

[they] knew"—i.e., in light of "everything that [they] w[ere] told and observed."  *Brown*, 240

F.3d at 390.  But under any reasonable understanding of what the deputies knew, their response

was unreasonable.  They claim they "did indeed take action in response to the risk as they

perceived it," (Defs.' Reply 17, ECF No. 97), but do not specify what action they took.  Instead,

the record reflects that none of the deputies took even the minimal step of mentioning to

Detention Center staff that Lihvarchik had used a pizza cutter on himself that night.  The

deputies rely on *Brown*, but that case is distinguishable.  In *Brown*, the Fourth Circuit held that

the two defendants responded reasonably because one "immediately plac[ed] [the detainee] on

'medical watch,'" 240 F.3d at 390, and the other "took deliberate, precautionary steps to reduce

the risk that [the detainee] would commit suicide[,]" *id.* at 391.  The deputies' responses come

nowhere near to those made in *Brown*.

Based on the record, a reasonable factfinder could conclude the deputies did in fact have

actual knowledge of Lihvarchik's suicide risk.  And, inaction in light of that risk would

constitute deliberate indifference.

### C.  Qualified Immunity as to Deputies LoRusso, Turvin, and Poole

The defendants also invoke the doctrine of qualified immunity.  Government actors are

entitled to qualified immunity from liability for civil damages "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982)) (internal quotation marks omitted).  Because a reasonable factfinder

could conclude that Deputies LoRusso, Turvin, and Poole were deliberately indifferent to

Lihvarchik's risk of suicide, and therefore deprived Lihvarchik of his Fourteenth Amendment

rights, the court must determine whether they are nevertheless entitled to qualified immunity on

the grounds that they did not violate any clearly established rights.  The court concludes they are

not.

"To be clearly established, a right must be sufficiently clear that every reasonable official

would [have understood] that what he is doing violates that right," and "existing precedent must

have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S.

Ct. 2088, 2093 (2012) (quotation marks and citations omitted).  Whether a right was clearly

established is "essentially [a] legal question" to be answered by the court. *Mitchell v. Forsyth*,

472 U.S. 511, 526 (1985).  In assessing whether a right is clearly established, this court looks to case law from the Supreme Court, the Fourth Circuit, and, sometimes, the Maryland Court of Appeals.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).

The right at issue here was clearly established by Supreme Court and Fourth Circuit precedent existing as of 2009.  The Fourth Circuit's decision in *Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1992)—a section 1983 jail suicide case—is illuminating.  In *Gordon*, the Fourth Circuit began by observing that "[t]he law of this circuit governing § 1983 actions arising out of jail suicides is clear."  *Id.* at 1094.  In addressing defendants' qualified immunity argument, the Fourth Circuit stated that the Supreme Court's *Estelle* decision, a Fifth Circuit decision, and two Fourth Circuit decisions "clearly establish[ed] the constitutional duty of a jailer to take reasonable measures to protect a prisoner from self-destruction when the jailer knows that the prisoner has suicidal tendencies."[16]  *Id.* at 1097.  A reasonable deputy in the deputy defendants' position would have known that failing to act in light of Lihvarchik's known suicide risk would be a violation of his constitutional rights.  Accordingly, the court concludes the deputy defendants are not entitled to summary judgment on the basis of qualified immunity at this time.

## II.  State Gross Negligence Claim

Also remaining is Fether's gross negligence claim against Deputies LoRusso, Turvin, and Poole.  Defendants make two arguments regarding this claim in their motion for summary judgment: first, that it is barred because Fether failed to provide notice to the State of Maryland under the Maryland Tort Claims Act ("MTCA"), (*see* Defs.' Mot. Summ. J. 67-69); and, second, that Fether's "allegations are insufficient to assert gross negligence as a matter of law," (*id.* at

---

[16] Although the deputy defendants were not necessarily Lihvarchik's "jailers," the Fourth Circuit has "recognized that where *police* know that a pretrial detainee is on the verge of suicide, that psychological condition can constitute the kind of serious medical need to which state officials must, under the due process clause, not be deliberately indifferent."  *Buffington v. Balt. Cnty., Md.*, 913 F.2d 113, 120 (4th Cir. 1990) (emphasis added).

71).  But the state court already addressed both arguments, holding that Fether's claim

"adequately plead[s] gross negligence" and that her "failure to provide timely notice as required

by the MTCA does not bar [her] claim for gross negligence against the Defendant Deputies."

(Pl.'s Opp'n Ex. 13, Op. and Order on Mot. Dismiss, *Fether v. State of Maryland, et al.*, Case

No. 10-c-12-1716, Mar. 27, 2012, ECF No. 92-13.)  This court agrees with, and has no need to

reconsider, the state court's determinations.[17]

The deputy defendants also invoke common law public official immunity in their reply

brief.  But "[t]he ordinary rule in federal courts is that an argument raised for the first time in a

reply brief or memorandum will not be considered."  *Clawson v. FedEx Ground Package Sys.,

Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citing *United States v. Williams*, 445 F.3d 724,

736 n.6 (4th Cir. 2006)).  No compelling reason exists to make an exception to that rule here.

Accordingly, the court considers the merits of Fether's gross negligence claim.  In doing

so, the court recognizes that "[w]hile the 'deliberate indifference' standard under federal law

may have similarities to the 'gross negligence' standard under state law, they are not fungible."

*Rodriguez*, 98 A.3d at 399-400.  Under Maryland law, gross negligence is "an intentional failure

to perform a manifest duty in reckless disregard of the consequences as affecting the life or

property of another, and also implies a thoughtless disregard of the consequences without the

exertion of any effort to avoid them."  *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (quoting

*Liscombe v. Potomac Edison Co.*, 495 A.2d 838, 846 (Md. 1985)).  "[B]ecause of the

'troublesome' factual problem of trying to differentiate between simple and gross negligence, the

issue is usually one for the jury, not the court."  *Holloway-Johnson v. Beall*, 103 A.3d 720, 735

(Md. Ct. Spec. App. 2014) (quoting *Rodriguez*, 98 A.3d at 391).  Here, depending on the

---

[17] At any rate, defendants' arguments would fail.  Fether adequately pled gross negligence.  And, having done so, Fether did not need to provide early notice under the MTCA.  *See Barbre*, 935 A.2d at 719.

resolution of the genuine factual disputes mentioned above, a reasonable factfinder could

conclude that each of the deputies were grossly negligent.  Accordingly, Deputies LoRusso,

Turvin, and Poole are not entitled to summary judgment on Fether's gross negligence claim.

**CONCLUSION**

As threshold matters, defendants Hyatt, Harris, and Sackett will be granted summary

judgment on all claims, and the counts alleging Fourteenth Amendment violations under the

"special relationship" and "state created danger" theories will be dismissed as duplicative.

Because no genuine dispute exists as to whether Correctional Officers Rosa and Burris were

deliberately indifferent to Lihvarchik's substantial risk of suicide, summary judgment will be

granted in their favor on the remaining Fourteenth Amendment claim.  But a genuine dispute

remains as to whether Deputies LoRusso, Turvin, and Poole were deliberately indifferent to that

risk, and because the right at issue was clearly established at the time of their conduct, summary

judgment will be denied as to them on that claim.  And because a genuine dispute likewise

remains as to whether Deputies LoRusso, Turvin, and Poole were grossly negligent, summary

judgment will be denied on that claim.

A separate Order follows.


February 6, 2015                                    _____/S/_____
      Date                                          Catherine C. Blake
                                                    United States District Judge